[No. B039160. Second Dist., Div. Five. May 1, 1991.]

CANADIAN COMMERCIAL BANK, Plaintiff and Appellant, v.
ASCHER FINDLEY COMPANY, Defendant and Appellant;
ISAAC BARANOWICZ et al., Defendants, Cross-complainants and
Appellants;
MONTGOMERY EQUIPMENT CO., Cross-defendant and Appellant.

COUNSEL

Mudge, Rose, Guthrie, Alexander & Ferdon, Christopher Norgaard and Elizabeth M. Matthias for Plaintiff and Appellant.

Parker, Milliken, Clark, O'Hara & Samuelian, Claire D. Johnson and Michael M. Mullins for Defendant and Appellant and for Defendants, Cross-complainants and Appellants.

Rutter, O'Sullivan, Greene & Hobbs, Warren G. Greene and Olivia Goodkin for Cross-defendant and Appellant.

OPINION

**GRIGNON, J.**—This appeal is part of a complex web of litigation arising from a limited partnership tax shelter investment gone awry. The limited partners seek to reverse a judgment entered against them pursuant to a jury's general verdict rendered in connection with their agreement to assume certain obligations of the partnership. One of the questions presented in this appeal is whether a creditor's failure to comply with the notice and commercial reasonableness requirements of California Uniform Commercial Code section 9504 necessarily bars a deficiency judgment against a limited guarantor of a note. We conclude that it does. We also consider the

cross-appeal of the primary lender, which seeks reversal of the trial court's order setting aside and vacating the jury's general verdict in its favor and entering a different judgment in favor of the general partner and against the lender. Finally, we are asked to reverse the posttrial order of the court denying attorney's fees and costs to a tax shelter-related entity which claims prevailing party status even though no judgment was entered in its favor.

## FACTS AND PROCEDURAL BACKGROUND

### *The HBDA II Limited Partnership*

Prompted by the 1980 oil boom, the Montgomery Drilling Company (MDC)[1] began to expand its oil drilling operations through the establishment of a number of limited partnerships. Ascher Findley Company (the General Partner)[2] was created to serve as general partner of the limited partnerships and to solicit limited partner investors. The fourth such partnership established, Huntington Beach Drilling Associates II (HBDA II), is the subject of this litigation.

HBDA II contracted with MDC, through its wholly owned subsidiary Montgomery Equipment Company (MEC), to fabricate a state-of-the-art oil drilling rig (the Rig) for use by HBDA II (the Fabrication and Reimbursement Agreement). By this Fabrication and Reimbursement Agreement, MEC agreed to fabricate the Rig for $5,016,000, which represented estimated material and labor costs of $4,180,000, plus MEC's fabrication fee or profit of $836,000. The material and labor cost was to be financed in part by means of limited partner investments and in part by means of financing provided by a commercial lender (the primary financing). The fabrication fee was to be deferred (the secondary financing) until the primary financing for the Rig was repaid. The Fabrication and Reimbursement Agreement conveyed a security interest in the Rig and reserved the rights of a secured creditor to MEC, including the right to a deficiency following postdefault disposition of the Rig. HBDA II also contracted with MDC to operate the Rig and to obtain drilling contracts (the Compensation and Reimbursement Agreement). Pursuant to this Compensation and Reimbursement Agreement, MDC was to be paid all expenses as well as a drilling manager fee.

Defendants and appellants Isaac Baranowicz et al. (the Limited Partners) are the limited partners who invested in HBDA II.[3] In all, 144 limited

---

[1] MDC has abandoned its appeal from the judgment.

[2] Ascher Findley Company was later known as the Findley Company and was finally succeeded by an entity called HBDA II Management, Inc.

[3] Some of the HBDA II limited partners have settled their claims and cross-claims and are not parties to this appeal.

partnership units were sold, at $15,000 per unit, which yielded a capital investment by the Limited Partners of $2,160,000.

The primary financing for the Rig, in the amount of $3.8 million, was provided by Crocker National Bank (Crocker) to HBDA II pursuant to a term loan agreement with amendments thereto, a term note, an amended and reinstated promissory note, and security agreement with amendments thereto (collectively, the Loan Agreement). Crocker took a primary security interest in the Rig and reserved the right to seek a deficiency from HBDA II. Shortly after the making of the Loan Agreement, Crocker sold a 25 percent participation in the loan to Canadian Commercial Bank (CCB).

*The Assumption Agreements*

In connection with their investments in HBDA II, the Limited Partners executed primary and secondary financing assumption agreements (the Assumption Agreements). These Assumption Agreements were conditions precedent to the Loan Agreement. The Assumption Agreements provided that the Limited Partners would, in the event of a default by HBDA II, assume severally but not jointly, 100 percent of HBDA II's primary and secondary financing debt for the Rig. This assumption of liability could not exceed a Limited Partner's pro rata share of HBDA II and was further limited to 82 percent of each Limited Partner's capital contribution, or $12,300 per unit. The total assumed liability was $1,771,200. The assumption of liability was without any rights against the partnership or the collateral and, under prevailing tax law, increased the amount put "at risk" by each Limited Partner. Tax deductible losses for each Limited Partner equalled his or her capital contribution together with the liability assumed under the Assumption Agreements.

The Assumption Agreements were silent as to whether, in the event of default by HBDA II and disposition of the Rig collateral, disposition proceeds must first be credited against that portion of the liability which was assumed by the Limited Partners or could first be applied to that portion of the liability which was *not* assumed by the Limited Partners. The Assumption Agreements were also silent as to whether MEC or Crocker had the first right to claim payment of the assumed liability by the Limited Partners. The Assumption Agreements included several clear and unequivocal waivers of the rights of the Limited Partners, with respect to the sale of any collateral under California Uniform Commercial Code section 9504, and similar provisions of other laws.[4]

---

[4] The Assumption Agreements provide in relevant part: "The undersigned waives: (a) any right to require the third party lenders to proceed against the Partnership and to give notice of the terms, time and place of any public or private sale of personal property security held

*The Oil Market Collapse and Resulting Litigation*

The Rig was completed in September 1981. In 1982, the oil drilling industry began an historic and precipitous decline, caused by falling oil prices and overbuilding of rigs, leading to sharply increased competition. HBDA II's drilling contract expired in March 1983, and the Rig was employed only intermittently thereafter. HBDA II had ceased making principal payments on the primary financing after 1982, and further ceased interest-only payments during 1983. Workout proposals were discussed by the Limited Partners and Crocker, but not executed. In November 1984, CCB and Crocker demanded payment from HBDA II under the Loan Agreement. Following demand by Crocker and CCB, HBDA II sought protection by filing a chapter 11 petition in bankruptcy. Negotiations for the reorganization of HBDA II began among the parties.

In April 1985, Crocker assigned its remaining interest in the Loan Agreement to CCB, which asserted primary rights to the portion of the liability assumed by the Limited Partners. No reorganization plan was ever negotiated. In June 1986, following the expiration of its contract, MDC resigned as driller-manager. The Rig ceased operation.

In September 1986, CCB filed its first amended complaint in the instant matter,[5] by which it sought repayment of the amounts owing under the Loan Agreement from the General Partner by operation of law and from the Limited Partners, pursuant to the Assumption Agreements. In November 1986, the Limited Partners filed a cross-complaint against CCB, MEC and MDC, seeking declaratory relief as to the issue of priority between CCB's and MEC's claims, and seeking damages for MEC's and MDC's alleged negligence, breach of fiduciary duty, and misrepresentation. A first amended cross-complaint was filed by the Limited Partners in January 1987. In May 1987, MEC cross-complained against the Limited Partners for monies owed under the Assumption Agreements and at common law, and against the General Partner by operation of law.

---

from the Partnership or otherwise to comply with Section 9504 of the California Uniform Commercial Code and similar provisions of other applicable laws, or to pursue any other remedy in the third party lenders' power whatsoever; and (b) any defense arising by reason of any modification of the financing arrangement in any form whatsoever, including without limitation the renewal, extension or other change in the terms of the financing arrangements and the notes evidencing the indebtedness of the Partnership to the third party lenders or any part thereof. The undersigned waives all presentments, demands for performance, notices of nonperformance, protests, notices of protests, notices of dishonor, and notices of acceptance of this Agreement and of the existence, creation or incurring of new or additional indebtedness."

[5]The original complaint, which was never answered, was filed on March 31, 1986. As of that date, $4,042,793.81 in principal and interest was owing pursuant to the Loan Agreement.

*The CCB-MDC-MEC Settlement*

Sometime in April or May 1987,[6] CCB, MDC, and MEC settled their claims against each other, pursuant to a written settlement agreement (the Settlement Agreement). The Settlement Agreement provided that CCB would take primary responsibility for pursuing payment by the Limited Partners under the Assumption Agreements, and that an agreed-upon percentage of collected funds, net of costs, would be allocated to MEC. In addition, CCB agreed to seek relief from stay in the bankruptcy court to foreclose on the Rig collateral. The Settlement Agreement also provided that the Rig would be leased at no cost to MDC, with an option expiring at the end of 1987 to purchase the Rig for $175,000. An undated bill of sale was attached to the Settlement Agreement. The lease required MDC to insure the Rig. The policy, designating MDC as owner, insured the Rig for $900,000. CCB moved in the bankruptcy court for relief from stay in May 1987, requesting the right to foreclose on the Rig. No objections were filed and relief was granted. On December 29, 1987, MDC exercised its option to purchase the Rig for $175,000.

In the normal course of discovery, the Settlement Agreement between MEC, MDC, and CCB was produced to the Limited Partners in October 1987. The Limited Partners and the General Partner learned, for the first time, of the disposition of the Rig, which they believed had a fair market value in excess of the $175,000 for which CCB purchased it.

*The Trial and Verdicts*

Trial commenced on August 19, 1988. The jury returned the following verdicts: (1) on CCB's complaint, a judgment in favor of CCB for $1,168,686 against the General Partner and for $1,771,200 against the Limited Partners; (2) on the Limited Partners' cross-complaint, a judgment in favor of the Limited Partners for $1,771,200 against MEC; and (3) on MEC's cross-complaint, a judgment against MEC and in favor of the Limited Partners and the General Partner.

The jury also returned special verdicts which included the following: (1) the Limited Partners and the General Partner failed to prove that CCB was obliged to credit the Rig disposition proceeds against the liability assumed by the Limited Partners under the Assumption Agreements; (2) CCB was required to and failed to give to the Limited Partners and the General Partner the predisposition notice required under section 9504, and the

---

[6] The Settlement Agreement was drafted in April but probably executed in May 1987.

Limited Partners were not estopped to claim lack of notice;[7] (3) CCB's disposition of the Rig was not commercially reasonable; (4) the General Partner was liable to CCB for repayment of the primary financing in the amount of $2,025,000, including interest to December 31, 1987; and (5) the Limited Partners were liable to CCB under the Assumption Agreements in the amount of $1,771,200.

The court ordered judgment entered on the jury's general verdict against the Limited Partners on CCB's complaint, and also in favor of the General and Limited Partners on MEC's cross-complaint. However, the court set aside and vacated the jury's general verdict and entered a different judgment: (1) in favor of the General Partner on CCB's claim, because the special verdicts established that CCB had failed to comply with California Uniform Commercial Code section 9504; and (2) in favor of MEC on the cross-complaint by the Limited Partners.

*Posttrial Motions*

On December 15, 1988, a hearing was held on CCB's motion to reinstate the general jury verdict in its favor and against the General Partner in the amount of $1,168,686. The motion was denied. The Limited Partners' motion to vacate the judgment against them and in favor of CCB, and to enter a new judgment in their favor was also considered on the same day. The motion was denied. CCB moved for and was granted an award of prejudgment interest at a rate of 10 percent from September 13, 1986, and was awarded its attorney's fees in full. The General Partner was awarded its attorney's fees on the claim by CCB. The motion by MEC for attorney's fees was denied. Notice of entry of judgment was served on September 19, 1988.

On December 19, 1988, the Limited Partners and the General Partner filed their notice of appeal from the orders (1) denying the Limited Partners' motion for vacation of judgment and entry of new judgment; (2) granting CCB's motion for prejudgment interest; and (3) granting CCB's motion for attorney's fees and costs.

On January 9, 1989, CCB filed its notice of appeal from (1) the court's entry of judgment in favor of the General Partner and against CCB; (2) the court's denial of CCB's motion to reinstate the verdict against the General Partner; (3) the award of attorney's fees to the General Partner; and (4) the jury's special findings as to notice, commercial reasonableness, and estoppel.

---

[7] No special verdict was presented to the jury which requested a finding as to whether the General Partner was estopped to rely upon the notice and commercial reasonableness requirements of California Uniform Commercial Code section 9504.

On January 9, 1989, MEC filed a notice of cross-appeal from the order denying the motion by MEC for attorney's fees.

DISCUSSION

*Appeal by the Limited Partners and the General Partner*

California Uniform Commercial Code section 9504, (hereafter section 9504) subdivision (1), provides that, after default, a secured party may sell, lease, or otherwise dispose of any or all of the collateral securing the indebtedness. Following the disposition of the collateral, the debtor is liable for any deficiency. (*Id.* at subd. (2).) Section 9504 requires that notice of the disposition of the collateral be given to the debtor, and that any such disposition be conducted in a commercially reasonable manner. (*Id.* at subd. (3).) ■ A commercially reasonable disposition is presumed to be in good faith and at the greatest possible market rate. (*Security Pacific National Bank* v. *Geernaert* (1988) 199 Cal.App.3d 1425, 1431 [245 Cal.Rptr. 712].) ■ The requirements of section 9504 are strictly construed. "If the secured creditor wishes a deficiency judgment he must obey the law. If he does not obey the law, he may not have his deficiency judgment." (*Atlas Thrift Co.* v. *Horan* (1972) 27 Cal.App.3d 999, 1009 [104 Cal.Rptr. 315, 59 A.L.R.3d 389].) ■ ■■■ ■ ■ Failure to comply with either the notice requirement *or* the requirement of commercial reasonableness will act as an absolute bar to a deficiency judgment.[8] *Crocker*

---

[8] Section 9504 does not specify what result follows from failure to comply with its requirements, and not all jurisdictions have adopted the absolute bar rule of *Atlas Thrift*. Some jurisdictions hold that upon proof of noncompliance, a presumption arises that the proceeds from the disposition equal the fair market value of the collateral. This presumption may be rebutted by the secured party and, if so rebutted, a deficiency judgment may be obtained. (See, e.g., cases cited at *Atlas Thrift Co.*, *supra*, 27 Cal.App.3d at p. 1007, fn. 6; 9 Hawkland, Uniform Commercial Code series, art. 9, (1986) § 9507:06; 9 Anderson, Uniform Commercial Code (1985) § 9-504:92.) Other jurisdictions offset against a deficiency judgment the difference between fair market value of the collateral and the proceeds from its disposition. (See discussion and cases at 9 Anderson, *supra*, § 9-504:93.)

Section 9504 has been amended, effective January 1, 1991, and provides in relevant part:

"(2)(c) If the secured party has provided notice to the debtor pursuant to subdivision (3), *if so required*, but has not proceeded in a commercially responsible manner in the disposition of the collateral, the debtor is liable, subject to paragraphs (b) and (d), for any deficiency only if the balance of the indebtedness immediately before the disposition exceeds the amount which the secured party establishes would have been realized had the disposition of the collateral by the secured party pursuant to this section been conducted in conformity with the conditions set forth in clause (i) of paragraph (b), and the liability is limited to their excess. This paragraph does not apply to secured transactions entered by a debtor primarily for personal, family, or household purpose.

"(2)(d) Notwithstanding paragraph (c), if any one or more of the conditions set forth in clause (i) of paragraph (b) are not proved by the secured party to be satisfied with respect to the disposition, then the debtor is not liable for any deficiency if either:

"(i) All of the collateral immediately before the disposition was consumer goods and the amount of the indebtedness immediately before the disposition was one hundred thousand

*Nat. Bank* v. *Emerald* (1990) 221 Cal.App.3d 852 [270 Cal.Rptr. 699].) The protections of section 9504 may not be waived by a "debtor" prior to default. (Cal. U. Com. Code, § 9501, subd. (3).) California Uniform Commercial Code section 9507 provides a right of action to recover losses caused by failure of the secured party to comply with section 9504 and defines "commercial reasonableness."[9]

The jury in this matter returned special verdicts finding that: (1) pursuant to section 9504, CCB was required to but did not give notice of the disposi-

---

dollars ($100,000) or less. "(ii) The amount of the indebtedness immediately before the disposition was fifty thousand dollars ($50,000) or less.

"$. \quad . \quad . \quad . \quad . \quad . \quad . \quad . \quad . \quad . \quad . \quad . \quad . \quad . \quad .$

"(2)(h) Nothing herein shall deprive the debtor of any right to recover damages from the secured party under subdivision (1) of Section 9507 or to offset any such damages against any claim by the secured party for a deficiency, or of any right or remedy to which the debtor may be entitled under any other law; provided, however, that, except in the case of any secured party which has willfully failed to conduct the disposition of collateral in good faith and in a commercially reasonable manner or in the case of a debtor who entered the secured transaction primarily for personal, family, or household purposes, any damages recoverable by the debtor shall be reduced by the amount of any deficiency which would have resulted has the disposition of the collateral by the secured party been conducted in conformity with *the conditions set forth in clause (i) of paragraph (b)* regardless whether or not the debtor is liable for the deficiency under paragraph (b) or (c)."

These 1991 amendments costitute the abandonment, in certain instances, of the "absolute bar" rule of *Atlas Thrift Co.* However, the absolute bar rule continues to be applicable in those instances in which notice is not given to the debtor. There is no express statement by the Legislature, either in the statutory amendments or in the legislative history, that the amendments were intended to be retroactively applied. Senate Bill No. 972, introduced on March 8, 1991, by Senator Beverly, is a "technical corrections" bill which may resolve the extent, if any, of retroactive application. We need not address this issue, however, because, even if the new amendments were applied to the facts before us, the same result would follow, since we specifically find that substantial evidence exists to support the special verdict that notice was not given to the Limited Partners or the General Partner.

[9] California Uniform Commercial Code section 9507 provides:

"If it is established that the secured party is not proceeding in accordance with the provisions of this chapter disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this chapter.

"The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either *sells the collateral in the usual manner in any recognized market therefor* or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable."

tion of the Rig to the General and Limited Partners and, further, that the Limited Partners were not estopped to assert such lack of notice and; (2) that the disposition of the Rig was not "commercially reasonable" within the meaning of section 9504.

■ The Limited Partners contend in this appeal that such special findings should have acted to bar the entry of judgment based on the jury's general verdict against them and for CCB in the amount of $1,771,200. Judgment was entered by the trial court on the general verdict because of the jury's additional special verdict that the General and Limited Partners failed to prove that CCB was obliged to credit the Rig disposition proceeds first against that part of the liability assumed by the Limited Partners under the Assumption Agreements. The trial court believed and instructed the jury[10] that noncompliance with section 9504 procedures could be asserted only by a party who, in some way, suffered a loss caused by such noncompliance. If the Rig disposition proceeds were not to be first applied to the assumed portion of the liability, the trial court reasoned, then the amount of the Limited Partners' liability would not be affected by the amount of the disposition proceeds, and no loss would have occurred as a result of the noncompliance.

*Are the Limited Partners Entitled to the Protections of Section 9504 as "Debtors"?*

*Is a guarantor a "debtor"?*

CCB contends that a guarantor is not a debtor for purposes of section 9504 and, therefore, is not entitled to the statute's protections. California Uniform Commercial Code section 9105, subdivision (1)(d), defines a "debtor" as a person ". . . who owes payment or other performance of the obligation secured, whether or not he or she owns or has rights in the collateral and includes the seller of accounts or chattel paper. Where the debtor and the owner of the collateral are not the same person, 'debtor' means the owner of the collateral in any provision of the division dealing

---

[10] The jury was instructed as follows: ". . . The Defendants and Cross-Complainants, Limited Partners, have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issue: [¶] That Canadian Commercial Bank ("CCB") was required to credit money received from selling the drilling rig against the part of the loan assumed by the Limited Partners. [¶] If Plaintiff and Cross-Defendant CCB was required to credit money received from sale of the drilling rig against the part of the loan assumed by the Limited Partners, CCB has the burden of establishing by a preponderance of the evidence the following issues [re: notice, commercial reasonableness, and estoppel to claim lack of notice]." (BAJI No. 2.60, as mod.) The jury was also instructed: "Limited partners are entitled to receive notice of a lender's intended sale or other disposition of a borrower's collateral if they prove that the lender is required to apply the money received from the sale or other disposition against the amount that they owe under the Assumption Agreements." (Instn. No. 103, citing *Brunswick Corp.* v. *Hays* (1971) 16 Cal.App.3d 134 [93 Cal.Rptr. 635]; see *infra* and Cal. U. Com. Code, §§ 9105, subd. (1)(d) and 9507, subd. (1).)

with the collateral, the obligor in any provision dealing with the obligation and may include both where the context so requires." (Cal. U. Com. Code, § 9105, subd. (1)(d).)

There is a split of authority among the districts of this Court of Appeal as to whether a guarantor is a "debtor" entitled to the protections of section 9504, and our Supreme Court has yet to consider this issue.[11] In *Rutan* v. *Summit Sports, Inc.* (1985) 173 Cal.App.3d 965 [219 Cal.Rptr. 381], the Third District, relying on a federal district court case from the Eastern District of Pennsylvania in which California law was applied, held that a guarantor was not a debtor and thus could waive the right to section 9504's notice of sale of collateral prior to default.[12] (*United States* v. *Kurtz* (E.D.Pa. 1981) 525 F.Supp. 734, 745-746 affd. (3d Cir. 1982) 688 F.2d 827.) This reasoning was rejected by this District and the First and Fifth Districts in *Connolly* v. *Bank of Sonoma County* (1986) 184 Cal.App.3d 1119 [229 Cal.Rptr. 396]; *C.I.T. Corp.* v. *Anwright Corp.* (1987) 191 Cal.App.3d 1420 [237 Cal.Rptr. 108]; and *American National Bank* v. *Perma-Tile Roof Co.* (1988) 200 Cal.App.3d 889 [246 Cal.Rptr. 381].

The *Connolly* court surveyed the law of other jurisdictions and concluded that the overwhelming majority of sister-state courts had reached a conclusion opposite to *Rutan*. The *Connolly* court concluded that the notice requirement exists to provide a debtor an opportunity to bid at the sale, to safeguard his right of redemption and to permit him to reduce his liability by all practical means. (*Connolly* v. *Bank of Sonoma County*, *supra*, 184 Cal.App.3d at p. 1124.) "Upon default, the guarantor becomes the primary debtor and is liable for any deficiency after sale or performance of other obligation. [Citations.] Accordingly, a guarantor has as much interest in protecting his rights during the sale or disposition of the collateral as does the primary debtor and therefore is equally entitled to notice." (*Ibid.*) *C.I.T. Corp.* endorsed the reasoning of *Connolly*, observing that "[the guarantor's] interest is at least as great as that of the debtor in seeing that a maximum amount is realized upon the sale of collateral." (*C.I.T. Corp.* v. *Anwright*

---

[11] One court has refused to apply California law on this issue because of the split in authority. In *American Honda Finance Corp.* v. *Bennett* (1989) 232 Neb. 21 [439 N.W.2d 459], the Nebraska Supreme Court considered whether the maker of a "continuing personal guaranty" of a security agreement governed by California law was entitled, as a "debtor," to the protections of section 9504. ". . . California law is unclear on whether a guarantor is entitled to notice. Further, no California court has determined what must be contained in a notice before it is valid." (439 N.W.2d at p. 462.)

[12] In this case, under the terms of the Assumption Agreements, the Limited Partners did waive their right to section 9504's notice of sale of collateral prior to default. The protections of section 9504 may not be waived by a "debtor" prior to default. Thus, the determination of whether the Limited Partners are section 9504 debtors is critical to the resolution of the issues on this appeal.

*Corp.*, *supra*, 191 Cal.App.3d at p. 1425.) Similarly, the court in *Perma-Tile Roof Co.* also declined to follow *Rutan* and adopted the reasoning of *Connolly* and *C.I.T. Corp.* Recently, the Ninth Circuit Court of Appeals refused to follow *Rutan* in *In re Kirkland* (9th Cir. 1990) 915 F.2d 1236, reasoning that as a federal court applying California law, it was "bound by the interpretation adopted by the majority of California appeals courts."

We are persuaded, along with the majority of California appellate courts which have considered this question, that a guarantor is a "debtor" for purposes of section 9504. Like the principal obligor, the guarantor "owes payment or other performance of the obligation secured." (Cal. U. Com. Code, § 9105, subd. (1)(d).) Like the principal obligor, the guarantor has an interest in preventing collusive or commercially unreasonable sales of collateral, so as to minimize its liability on the obligation secured. Like the principal obligor, the guarantor requires notice of the disposition so that it may redeem the collateral, or bid at sale, or produce other bidders at sale. We perceive no policy which would argue for differential treatment, generally, of guarantors and principal obligors in this respect.

*Should Assumption Agreements Be Treated Differently Than Guaranty Agreements?*[13]

We also perceive no material differences between the Assumption Agreements at issue here and the guaranty agreements discussed in *Connolly*, *C.I.T. Corp.,* and *Perma-Tile Roof Co.* We note that CCB does not argue that one who assumes a debt is materially different from one who guarantees a debt. In fact, there are only two differences between these types of contracts under California law. First, a guarantor has the right to proceed against his principal obligor for indemnification. (Civ. Code, § 2847.) A guarantor may waive this right. Here, in order to maximize the tax benefits of their investments, the Limited Partners became "obligors of last resort" without any rights against HBDA II, so that their assumed liability would be considered "at risk" and, therefore, tax deductible. Second, guarantors are also entitled to insist that the secured party proceed first against the collateral and/or the principal obligor before enforcing the guaranty. (Civ.

---

[13] The argument that the California Uniform Commercial Code does not apply to the Assumption Agreements, because they do not constitute security instruments, is correct but misses the point. The Loan Agreement, pursuant to which the Rig was disposed *is* an instrument "which [was] intended to create a security interest in personal property." (Cal. U. Com. Code, § 9102, subd. (1)(a).) The issue is whether the Limited Partners are entitled, as section 9504 "debtors," under the Loan Agreement to invoke the protections of section 9504. Thus, whether the protections of the Civil Code have been waived or are otherwise not applicable to the Assumption Agreements as suretyship and not security agreements does not resolve the issue whether the Limited Partners, as "debtors," are independently entitled to the protections of the Commercial Code, as they apply to the Loan Agreement.

Code, §§ 2845 and 2849.) A guarantor may also waive this right. Here, all such rights were waived by the Limited Partners in the Assumption Agreements, rendering them the primary obligors upon HBDA II's default. Thus, the Limited Partners' liability in this case was more like that of a primary obligor than a mere guarantor.

*Should Limited Guaranties Be Treated Differently Than Full Guaranties?*

CCB contends that even if unlimited unconditional guarantors are entitled to section 9504 protection, limited guarantors should be protected only to the extent they can show a loss. CCB argues that the agreements at issue in *Rutan, Connolly, C.I.T. Corp.,* and *Perma-Tile Roof Co.* were unlimited unconditional guaranties of the obligations of the principal and, therefore, not applicable to the limited guaranties involved in this case. They argue further that *Brunswick Corp.* v. *Hays, supra,* 16 Cal.App.3d 134, on the other hand, involved a limited guaranty and, therefore, should be controlling here.

In *Brunswick,* the defendant had purchased from the plaintiff $239,056 in bowling equipment. The defendant made a $2,000 down payment with the balance owing over 96 months at 6 percent interest. Plaintiff retained a security interest in the bowling equipment. At plaintiff's request, defendant also provided a guaranty agreement which stated: " '[n]otwithstanding any other provisions, the total amount of Guarantor's obligation hereunder shall be limited to the first four years' payments on the order contract totaling $118,528.16.' " (*Brunswick Corp.* v. *Hays, supra,* 16 Cal.App.3d at p. 136.) Following default on the sales contract by defendant, plaintiff repossessed and sold the equipment at private sale for $147,000. Defendant refused to pay the deficiency of $90,056, contending that the disposition proceeds exceeded the guaranty amount and exonerated him from further payment.

The Court of Appeal disagreed, noting that the terms of the guaranty agreement constituted a waiver of defendant's right to insist, pursuant to Civil Code sections 2845 and 2849, that plaintiff give defendant the benefit of all security held and, thus, plaintiff's resort to the collateral did not constitute an exoneration of the principal obligation. The protections of the Civil Code pertaining to surety contracts may be waived. (*Wiener* v. *Van Winkle* (1969) 273 Cal.App.2d 774 [78 Cal.Rptr. 761].) The court held: "We conclude that in the absence of a specific provision to the contrary in the contract of guaranty, proceeds from the sale of the equipment could only be applied to exonerate the limited guaranty to the extent that the proceeds of the sale exceeded the amount of that portion of the original debt

not covered by the limited guaranty." (*Brunswick Corp.* v. *Hays, supra*, 16 Cal.App.3d at p. 139.) In other words, proceeds from the sale of the collateral would first be applied to the unguaranteed portion of the debt before reducing the guaranteed portion.

CCB argues that *Connolly*, *C.I.T. Corp.*, and *Perma-Tile Roof Co.* do not apply to the instant case, because the agreements at issue in those cases were unconditional guaranties of the entire amount of the principal obligation. In those instances, CCB contends, the debtor truly does have as much interest in the proper disposition of the collateral as does the principal obligor, as a higher price at sale will result in a dollar-for-dollar reduction in the liability of the guarantor. In this case, the Assumption Agreements operated as limited guaranties of the principal obligation, much like the agreement in *Brunswick*.

*Brunswick* is not controlling. *Brunswick* deals with the issue of exoneration of the principal debt and whether the disposition proceeds should be applied so as to effect an exoneration. The Commercial Code provisions at issue here were not even discussed in *Brunswick* because the defendant did not "attack the regularity of the sale." (*Brunswick Corp.* v. *Hays, supra*, 16 Cal.App.3d at p. 137.) Thus, the most one could conclude from *Brunswick*'s application to the instant case is that the Rig disposition proceeds should first be applied to the unassumed portion of the Loan Agreement obligation, since there was no specific provision to the contrary in the Assumption Agreements. *Brunswick* simply does not answer the question whether a limited guarantor is entitled to a section 9504 notice and a duty of commercial reasonableness, if the disposition proceeds are applied first to the unguaranteed portion of liability.

CCB asks us to apply a gloss to *Brunswick*, constructed from the peculiar arithmetic of the transaction at issue in this matter.[14] CCB argues that the liability on the Rig exceeded $4 million, and the highest estimate offered at trial of the Rig's value was its insured value of $900,000 (with all other estimates in the $150,000 to $300,000 range). Therefore, the Rig's disposition could not have affected the Limited Partners' assumed liability of $1.7 million, since the unassumed portion of the liability, to which the proceeds were to be applied first, was approximately $2.3 million. This, they contend, distinguishes all other California cases which hold that guarantors are "debtors" under section 9504. We find this contention unpersuasive.

---

[14] The application of section 9504's strict requirements unquestionably works a harsh result in this case, because of the disparity between the value of the collateral and the debt. This is not a unique situation. See the similarly harsh result in *In re Kirkland, supra*, 915 F.2d 1236, where the line of credit involved $1,450,000, and a portion of the collateral was disposed of, without notice, for $59,000.

In many instances, a limited guaranty may nearly equal the total principal obligation. Surely a 90 percent guarantor has virtually the same interest in proper disposition of collateral as does the principal obligor. Additionally, if the value of the collateral is high enough, its disposition will affect the amount of the liability flowing from even a very small limited guaranty. In this case, if the Rig had held its construction value of $4 million, the manner of its disposition would have been of critical consequence to the Limited Partners. The interplay between the amount of the debt and the percentage of the debt guaranteed, as well as the market value of the collateral, is what will determine whether a limited guarantor will be adversely affected by a secured creditor's improper disposition of the collateral. Thus, we cannot say, as a general rule, that limited guarantors suffer no loss from noncompliance with section 9504. Furthermore, we cannot, by this decision, fashion a workable rule which protects some limited guarantors and not others. That is a job best left to our Legislature, should it be so inclined.

CCB urges this Court to recognize, *post facto*, that the fair market value of the Rig, even if obtained by sale, would not have relieved the Limited Partners from their liability on the Assumption Agreements. However, since the purpose of both the Uniform and California Uniform Commercial Codes is to create predictability and stability in the marketplace, it must provide rules which operate clearly and *prospectively*. One can imagine many situations, like the instant one, where, prior to sale, creditors, principal obligors, and debtors disagree as to the value of the collateral and therefore as to whether the guarantors, for example, will incur a loss if the collateral is disposed of improperly without notice. Such an ad hoc solution would invite unnecessary litigation. The alternative is to enforce section 9504's protections in all limited guarantee situations. We note that the requirements of that section are not burdensome and their uniform application works no hardship on secured creditors.[15]

Thus, we hold that limited guarantors are entitled to the protections of section 9504, including the absolute bar to a deficiency judgment upon noncompliance. The Limited Partners need not prove a "loss" from the Rig disposition in order to invoke the protections of section 9504. Whether they would be required to prove a "loss" in order to bring a cause of action for damages against CCB under California Uniform Commercial Code section 9507 is irrelevant, since such proof has never been required by California courts with respect to section 9504.

---

[15] A similar argument—that California Uniform Commercial Code section 9507 (damages for "loss") constitutes the exclusive remedy for noncompliance with section 9504—was raised and rejected in the context of principal obligors. Principal obligors simply need not prove a "loss" from noncompliance with section 9504 in order to invoke that section's absolute bar for noncomplying dispositions. (*Atlas Thrift Co.* v. *Horan, supra,* 27 Cal.App.3d at p. 999.) For the reasons stated, we see no reason to fashion a different rule for guarantors.

In view of the foregoing, we find that the trial court's refusal to vacate the judgment and enter a new judgment in favor of the Limited Partners, based on the jury's special findings regarding lack of notice and commercial reasonableness under section 9504 was error, since the judgment as entered was not "consistent with or supported by the special verdict[s]". (Code Civ. Proc., § 663.) (See discussion, *post*, regarding the sufficiency of the evidence supporting those findings.) The jury's special verdict that the Limited Partners did not suffer a "loss" from the improper disposition of the Rig has no effect on CCB's noncompliance with section 9504 which constitutes an absolute bar to CCB's deficiency judgment against the Limited Partners. Because we reverse the general verdict against the Limited Partners, we need not address whether the verdict in favor of the General Partner acts to limit the liability of the Limited Partners, whether prejudgment interest was properly computed, or whether CCB was properly awarded attorney's fees and costs.

### Cross-appeal by CCB

*Sufficiency of the Evidence to Support the Special Findings Re: Compliance With Section 9504*

■ As noted above, the jury in this matter rendered a general verdict against the Limited Partners and in favor of CCB in the amount of $1,771,200. The jury also returned a general verdict in favor of CCB and against the General Partner in the amount of $1,168,686. The trial court entered judgment in favor of the General Partner in view of the special verdicts finding that CCB's disposition of its collateral had not been commercially reasonable, and that CCB had not complied with the notice provisions of section 9504 of the California Uniform Commercial Code with respect to both the Limited Partners and the General Partner. CCB appeals from this order, contending that substantial evidence does not exist to support the special findings at issue. Because we have reversed the trial court's order denying the motion of the Limited Partners to vacate the judgment and enter a new judgment, we will address this issue as it now affects both verdicts against CCB.

■ In reviewing the sufficiency of evidence on appeal, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged to uphold the verdict, if possible. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) Our power begins and ends with the determination as to whether there is *any* substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. (*Ibid.*) We have no power to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the

reasonable inferences that may be drawn therefrom. (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757].)

■ Substantial evidence unquestionably exists to support the special findings regarding notice and commercial reasonableness.[16] First, CCB concedes that the Settlement Agreement by which the Rig was leased to MDC was drafted in April and executed perhaps as late as May 1987, without notice to the General Partner or the Limited Partners. CCB argues that the option to purchase the Rig was not executed by MDC until December of that year, more than two months after a copy of the Settlement Agreement was delivered to counsel for the Limited Partners and the General Partner, and that the Rig was not "disposed" of until the option was exercised, consideration of $175,000 paid, and the bill of sale delivered. We disagree.

Section 9504, subdivision (1), expressly refers to the sale, *lease* or other disposition of collateral. Section 9504, subdivision (3), also refers to the sale or *lease* of collateral. "Subsection (1) does not restrict disposition to sale: the collateral may be sold, leased or otherwise disposed of . . . ." (Cal. U. Com. Code com., § 9504, 23C West's Ann. Cal. U. Com. Code (1990 ed.) p. 598, italics added.) Whether the Rig was sold upon MDC's exercise of its option following notice to the Limited Partners and the General Partner is irrelevant if the Partners were not given notice of the lease, which is plainly considered a "disposition" within the meaning of section 9504. The Settlement Agreement itself refers to the "Disposition" of the Rig. We conclude, therefore, that substantial evidence exists to support the jury's special verdict that notice of the disposition of the collateral was not given.

We also find that substantial evidence exists to support the jury's special verdict that the disposition was not commercially reasonable, within the meaning of section 9504.[17] Evidence was adduced at trial which indicated that the Rig was sold at a below-market rate to the company whose wholly-owned subsidiary held a security interest in the Rig. The jury may have inferred from the Rig's construction cost of over $4 million (not including profit of $836,000) that the disposition price of $175,000 was substantially below market, despite adverse conditions in the oil drilling industry. Additionally, testimony was offered that the Rig had an insured value of $900,000. One witness testified that he inquired of CCB about purchasing

---

[16] It appears from the record that any claim of ambiguity in these special verdicts has not been properly preserved for appeal. (*Nanny* v. *Ruby Lighting Corp.* (1952) 108 Cal.App.2d 856, 859 [239 P.2d 885].)

[17] CCB does not contend that, and so we do not address whether, the granting of the motion for relief from stay by the bankruptcy court constitutes approval of the disposition in "any judicial proceeding" within the meaning of section 9507 and therefore establishes conclusively the commercial reasonableness of the disposition.

the Rig, and claimed to have mentioned a possible price of $300,000. Two witnesses testified that their inquiries regarding purchase of the Rig were rebuffed by CCB, which stated that the Rig could not be sold because of "legal problems." Finally, the jury may have inferred from the secrecy which surrounded the settlement negotiations and the fact that the Limited Partners and the General Partner learned of the Settlement Agreement only through formal discovery that the arrangement was a collusive one.

CCB offered expert and other testimony to establish that $175,000 was a commercially reasonable price for the Rig. CCB also offered testimony that the Rig was insured for an amount in excess of its market value because of the possibility of multiple partial losses, which was done with all MDC rigs. CCB also offered testimony to the effect that the comments regarding "legal problems" were harmless references to the bankruptcy court stay in effect rather than part of a collusive arrangement with MEC and MDC. The jury may, however, have disbelieved all of the evidence offered by CCB. Whether the evidence, which was believed by the jury and relied upon in arriving at the special verdicts at issue, was contradicted by CCB is immaterial.

*Was the Rig Disposition Exempt From Section 9504 Notice Requirement as a Good Sold on a Recognized Market?*

■ Section 9504 exempts from its notice requirement any collateral which "is of a type customarily sold on a recognized market." This exemption refers to collateral such as stocks and bonds (see, e.g., *Hersch* v. *Citizens Savings & Loan Assn.* (1983) 146 Cal.App.3d 1002 [194 Cal.Rptr. 628]), which are widely traded on exchanges such as the New York Stock Exchange or commodities markets and for which daily price quotations are available. Most jurisdictions hold that even used automobiles do not constitute "goods sold on a recognized market" despite the availability of published price guides. (See cases collected at 9 Uniform Commercial Code Case Dig., (Callaghan 1988) § 9504.31.) The evidence adduced at trial that one auction company kept a computerized account of rig sale prices or that auction catalogues were available is insufficient to establish that the Rig was a "good sold on a recognized market." Thus, this exemption from section 9504's notice requirement does not apply.

*Effect of Evidence of Estoppel on Special Verdicts Re: Noncompliance With Section 9504*

The trial court in this matter vacated the general verdict in favor of CCB against the General Partner as being inconsistent with the jury's special verdicts that CCB had failed to give predisposition notice to the General Partner or to dispose of the Rig in a commercially reasonable manner.

██   CCB argues that the special verdicts are not inconsistent with the general verdict, because substantial evidence was presented to the jury that the General Partner was estopped to invoke the protections of section 9504. We disagree.

First, we seriously doubt whether the doctrine of estoppel may be employed offensively to absolve a secured party from its failure to comply with the strict requirements of section 9504. California interpretive law is quite clear that predisposition notice may only be waived in writing by a debtor *after* default. Similarly, any estoppel to claim notice must be constructed from postdefault conduct or representations of the debtor. Given the requirement that postdefault waiver of disposition notice must be in writing, evidence of estoppel should also be grounded on a writing so as not to displace that specific provision of the Commercial Code. "*Unless displaced by the particular provisions of this code*, the principles of law and equity including . . . the law relative to . . . estoppel . . . shall supplement its provisions." (Cal. Uniform Commercial Code, § 1103, italics added.)

Secondly, no California cases exist in which a debtor was estopped to assert the absence of commercial reasonableness in a disposition of collateral. We have also reviewed the law of other jurisdictions in this respect. We find that in those few cases in which estoppel was found, it was based on an express agreement between the debtor and the secured party as to the disposition of the collateral. Having made such an agreement, the debtor will be held to it, absent unconscionable terms. (See, e.g., cases discussed at 9 Anderson, Uniform Commercial Code, *supra*, § 9-504:14 at pp. 708-711.) Here, there was no evidence of any such express agreement.

Thirdly, we find that substantial evidence was not presented to the jury to support any estoppel claim. Evidence was presented that CCB and the General Partner communicated on many occasions during the period in question. However, the only testimony by CCB as to when notice of the disposition was actually given by CCB was the testimony of a CCB officer that he "believe[d]—I initially told the general partner in mid-1987 that we were going to sell a rig, we had leased it." Notice in mid-1987 *followed* the disposition of the Rig by the terms of the April/May Settlement Agreement. We find no evidence of estoppel in the record as to the General Partner with respect to the commercial reasonableness of the Rig disposition.[18] The trial court correctly found the special and general verdicts to be

---

[18]Further, since the establishment of compliance with section 9504 is part of CCB's prima facie case for a deficiency judgment, CCB should bear the burden associated with its failure to submit the question of estoppel to the jury. However, in view of the strict requirements of section 9504 and the absolute dearth of evidence presented, such a special finding could not have survived an attack on appeal.

absolutely inconsistent. We affirm the vacation of the general verdict in favor of CCB and against the General Partner, and the entry of a different verdict against CCB and in favor of the General Partner, based on CCB's noncompliance with section 9504.

## *Cross-appeal by MEC*

MEC appeals from the decision of the trial court denying to MEC its attorney's fees, provided for under the secondary financing agreement and Civil Code section 1717, on the basis that it was not a "prevailing party." MEC contends that it was to receive 26.5 percent of the judgment obtained by CCB against the Limited Partners, pursuant to the Settlement Agreement, and on the basis of this "net monetary recovery" was also entitled to receive its attorney's fees and costs. Because we reverse the judgment in favor of CCB and against the Limited Partners, we need not address this issue, as neither CCB nor MEC can now be considered to be a "prevailing party."

## DISPOSITION

The judgment in favor of CCB and against the Limited Partners is reversed. The trial court is ordered to vacate its order denying the motion to vacate the judgment and to enter a new order granting the motion, setting aside and vacating the judgment against the Limited Partners and in favor of CCB, and ordering entry of a new and different judgment in favor of the Limited Partners and against CCB. The judgment in favor of the General Partner and against CCB is affirmed. The order denying attorney's fees and costs to MEC is affirmed. The Limited Partners and the General Partner shall recover their costs on appeal.

Ashby, Acting P. J., and Boren, J., concurred.

A petition for a rehearing was denied May 22, 1991, and the petition of plaintiff and appellant for review by the Supreme court was denied August 1, 1991.